Good morning. May it please the Court, my name is Gia Kim, appearing on behalf of Appellant David Richardson. I will be focusing on the Sufficiency and Confrontation Clause issues this morning. On sufficiency, the government argues that the evidence in this case, considered as a whole, is sufficient to support all five of Mr. Richardson's convictions for filing false claims. Barring an analogy from this Court's recent decision in Rosales, in its 28J letter, the government argues that the trial evidence is like, quote, threads woven into a tapestry, where each, quote, individual thread may mean very little until the tapestry is completed and a clear image appears beyond any reasonable doubt. However, the government's evidentiary tapestry in this case has gaping holes with respect to falsity, a required element of conviction. First of all, we're really talking about five evidentiary tapestries here. The jury was instructed that a separate crime was charged in each count, that it had to consider each count separately, and that its verdict on one count could not control its verdict on the other counts. Both at trial and on appeal, the government tried to patch over the holes in its case by arguing that the evidence cumulatively supported conviction on all counts. Because the government has never set forth, either at trial or on appeal, what evidence exists specifically for each count, that's what I'd like to do this morning, proceed through the evidence count by count. Before I do that, however, I'd like to point out a basic flaw with what I'll call the government's sham entity evidence, which it relied heavily on to carry its burden for all counts. For instance, the government devoted a lot of trial time to showing that the defendant, David Richardson, controlled CCK and the successor corporation, Everyone Can Play, that he was CCK. That wasn't really in dispute at trial, but that's not enough. To prevail on the sham entity theory, the government has to show that these corporations were particular kinds of sham entities. For instance, it's not enough to show that the defendant commingled his personal assets and corporate assets. It's not enough to show that he diverted the corporate assets to pay himself very large wages. There could be underlying illegal activity not charged here that nevertheless supports a true tax return. Rather, the government had to make a very specific showing with respect to falsity that the actual wage and withholding numbers reported on the returns were not in accord with the facts, and that's where they fell short here. For each count, there were several types of evidence produced. Not each kind of evidence existed for each count. Count 1, which was the tax year for 2000, included business activity evidence mostly provided by family members, tax preparer interactions, bank account evidence, and evidence about CCK, the corporation's tax filings. Starting with the business activity evidence, we heard from the defendant's siblings who helped out with the corporation, either on a paid or sort of volunteer basis right when it was getting off the ground. The jury heard testimony that in 1999, before the years covered by these claims and the tax years covered by these claims, the defendant had started CCK and was basically running it out of his house. By May 2000, we heard from the brother, Douglas Richardson, the attorney, that he had helped with the incorporation of CCK and that they had moved to an office space in Artesia. We heard that as of May 2000, the defendant told his brother that CCK had no income, and that was the last we heard about its financial activities. We also heard from Diana Jamey, the defendant's sister, who worked a maximum of three months, she wasn't quite sure, two to three months in 2000 or 2001, again, the testimony conflicted, for CCK. She said she didn't see many visitors to the office, and at that point she was the only employee. However, she did know during that time, her brief tenure there, that the corporation produced this booklet, consulted sponsors, secured Knott's Berry Farm as a sponsor, and sponsored two books. She said that she was paid, but that no federal taxes were withheld from her paycheck. That becomes significant because there is bank account evidence that covers part of the year 2000, but there are no paychecks to Diana Jamey in that account, which I'll mention more later. We also heard from the defendant's nephew, who was paid a nominal fee to distribute booklets at one of the tournaments, which occurred out of state in Las Vegas. And then we heard from the defendant's estranged ex-wife, or estranged wife, who also confirmed the corporate sponsorship, said that she had asked the defendant to help out because he had money coming in, but that she wasn't really privy to CCK's finances. She hadn't worked for the company or served as a director. The government also introduced evidence about how the 2000 tax return came into being. The defendant had gone to see Carmen Melton, who worked at H&R Block in Covina. She prepared a return reporting wages of about $288,000, withholding about $141,000. She didn't tell IRS anything was wrong with the return. As far as we can see from the IRS records that were in the record, at Government's Excerpt 101, the defendant was credited with $141,000 of withholding, and as of September 2006, basically the time of trial, it hadn't been reversed. The refund of $38,000 was paid, and again, that IRS record showed that it hadn't been reversed. The check that was later submitted in 2004, contrary to the government's argument, doesn't support conviction on Count 1 either, specifically because the refund had been paid, and as far as we could see, it was not in question, so there was no need to cover that amount for that return. Turning to the bank account evidence, the first bank account at Foothill Bank, there are five bank accounts, three at Foothill Bank, two at Crowell-Wheaton. The most activity was in the first account at Foothill Bank, ending in the numbers 153. Before I go into the specifics of that evidence, it should be noted that the expert who spoke about the prosecutor had not researched or investigated them herself, she just reviewed them, and she never testified that these were the only bank accounts in evidence. So this first bank account, ending in 153, was open for about half, slightly less than half of the tax year 2000. It was open in July 31st, and it went to May 31st of the year for the company in 2000 or 2001, we're not sure exactly when. There were a couple large deposits from Washington Mutual that year, totaling over $470,000 in December of that year. There is one rent check in that account for the Artesia office space. There aren't any rent checks before or after that, though we know that the company was in that year 2000 because that's what the brother testified to. So this evidence suggests that there were other bank accounts out there that CCK was drawing from, and that, therefore, this evidence alone can't support conviction. You know, we're looking at whether the – viewing the evidence in the light most favorable to the government, no rational jury could have decided as it did. And so even though the evidence that you're discussing could support a different verdict, the question is was there some gap that was so significant where there was no evidence or that no rational jury could have credited that evidence that that would say that those counts had insufficient evidence supporting them. And so I'm hearing from you there was – this evidence was stronger than that evidence or there – you could make other inferences, but how does that lead to an insufficiency of proof? In a few respects. I guess the government's – to be sufficient, I think the government would have had to at least make some sort of showing as to what bank accounts were out there. There's the whole first half, seven months of that year that tax return covers that there's no bank account evidence on. Well, they indicated what bank accounts they knew about, and I take it the defense didn't say, but you missed all these other bank accounts. So I'm not sure – unless there was some evidence that there were other bank accounts out there, why couldn't the jury just have credited – you know, there were these – the bank accounts that the government pointed to. I don't think in the record that there was even a statement saying that these are the only ones we found. All the expert who reviewed them said was these are the records I received from the prosecutor. So – What was there – my question is, was there any evidence presented that there was some bank account on which CCK actually paid employees and took withholding? In other words, was there evidence given to the jury that there were employees, you know, paid a salary and there was withholding taken? There was no evidence specifically of an account from which these payroll checks or withholding were issued. There were – there was evidence of other employees up to as late as 2001 in the larger office. We heard about many employees working there. We don't know how they – But was there any evidence – was there any evidence submitted that when these other employees were paid that there was withholding taken out of their pay? No. Diana Jamey, the only employee that we heard from, said she was paid. She didn't say in what manner specifically, but she said that no federal tax withholding was taken out. Let's resume. Also on count one, there are no records of whether the withholding deposits were actually made. This was due in large part to the district court's discovery ruling. And again, the only IRS record we have that shows what occurred with respect to Mr. Richardson's personal account once it reached – once it hit the IRS and, you know, was processed there is that government's Excerpt 101 that credits the defendant with this withholding that was never reversed. On count two, which is – there are two returns for 2001. The first one was the return that was rejected because the refund amount was too large to deposit through direct deposit that had been e-filed. For 2001, we had very little information about what was going on The jury heard of CCK was the defendant's wife saying that they had moved into a very large office in Irwindale, and there was a receptionist and many employees. As far as the tax preparers go, this return was also prepared at H&R Block and Covina, the same office. The return was rejected, as I said, because the refund amount was too big for filing. After the – So for that year, during that year, when they were in the bigger office and there were other employees, was there any evidence submitted that showed that when the other employees were paid that some withholding was taken out of their salary? No, there was not for that year. There was no evidence even of those employees being paid. There were checks in one of the accounts to various individuals for services rendered. The jury did not hear who any of those individuals were or what those services were for. Returning to the tax preparer information on Count 2, H&R Block followed up. They called Mr. Richardson after this return was rejected. He didn't come back to their office to file the return, which the government takes as an inference, you know, that he was afraid something, you know, he had been discovered or he was unwilling to return there after the rejection of his return. As I mentioned, the reason for rejecting the return doesn't itself bring up any inference of fraud. And actually, a couple years later, Mr. Richardson returned to this very same H&R Block office when he spoke to Salah Jarrah in 2004. So two years later, he did return to that office to have his return prepared. In the meantime, he had gone to another office, another tax preparer, Jackson Hewitt, in a different city. The check, again, doesn't relate to this count because that return was rejected. There was no withholding deposit that would have to be accredited. So that return basically wasn't pending anymore. The same bank account was open for part of this year, up until May. And as Judge Gould asked, there was no record of withholding checks, but nor were there records of other type of checks such as payroll checks, rent checks for the office in that account. Do you want to address your confrontation clause argument? You're running out of time. Sure. I'd briefly turn to that. Here, the district court precluded defense counsel from inquiring of Marlene Snyder, the defendant's mother, whose name was on this check that bounced, that was sent to the IRS, about whether, two years after that check was sent, whether she had told her daughter not to speak about that check. This was a violation of the confrontation clause because it didn't allow the jury sufficient time, sufficient information with which to appraise her biases and motivation. They did, the jury did know it's true that her name was on the check and that the defense counsel had asked her whether she had signed the check. Right before this question, defense counsel had asked whether it was true, as Ms. Jamie, the daughter, testified that she, at the time the check was sent, had asked for the address of the IRS because she said she was sending a And in fact, the defense attorney said, well, and if somebody said this, they would be lying, right? So was trying, was highlighting the conflict between her testimony and her daughter's testimony. Right. That's correct. So asking her about whether she later obstructed that was crucial to her credibility before the jury, because if she had said yes, which it appeared the parties were assuming she would, it would shed light, it would cast doubt on her previous denial of being involved with the check whatsoever. Let me ask a question, if I may, about that. And I may have misread this, but I thought that the judge wouldn't permit the questions on cross-examination during the government's case, but that the court said that the defense could call her and pursue the questions otherwise in its case. So the court was making a ruling on the traditional scope of cross-examination being confined, you know, by the scope of the direct. But so did I misunderstand that? And if she could have been questioned in a defense case, you know, how does that affect a confrontation clause argument? Sure. That's correct. The district court did say that the defense could raise it in their case in chief. First of all, I'd like to say that it was error based on to exclude this cross for bias, even though it was outside the scope of direct. Even so, the district court didn't cure this error by giving the opportunity to raise in the case in chief. In evaluating harmlessness, if we look at the factors set forth in Delaware v. Van Arsdale, one of them is the opportunity for other cross-examination of this witness. I haven't seen any case law suggesting that direct examination of the witness is equivalent, especially here when the defendant did not present any evidence and this would have been the only reason, you know, instead of choosing to rely on the presumption of innocence, this would have been the only reason for the defendant to bring an affirmative case. Since the confrontation clause prevents the right to the opportunity to cross-examination, I have not seen any cases where direct examination has been the cure for that. Direct examination would be, could be adverse, though. That's right. In other words, if they called her, they could ask leading questions and examine her, at least as I would understand the trial rules, in the same way they could have examined her. I'm not sure of the answer to how they could have examined her. They could have called her as a hostile witness and asked her leading questions. Okay. All right, so your time's up. So thank you very much. Good morning, Your Honors. Bob Gannon on behalf of the United States. I believe that the case of Rosales, the recent pronouncement of this particular court, is extremely helpful in terms of evaluating this, the evidence in this particular case. And I say that because Rosales reiterates the well-known standard for sufficiency of evidence, and moreover, does provide the illustration referred to by counsel, that being that of the tapestry and the comparison between analyzing isolated threads, which in and of themselves examined, again, by themselves, certainly would not constitute a tapestry. But yet one interwoven and integrated together would, in fact, form a tapestry. And in effect, as to counts one through five, this clearly, I don't think there's any dispute, was a circumstantial evidence case. And there was a pattern of behavior which, on the part of the defendant, and certain facts which were elicited by the government in its case, that would allow the jury to make the inferences that it did. I think it's interesting in this particular case, apparently the jury had no trouble with any of the counts. And there were five counts which were similar, that is, making a false claim. And just as an aside, somewhat of And I mention that because it appears as though the breadth and depth of the evidence which would be relevant on the issue of a false claim would be different than the breadth and depth of evidence which might be relevant on just filing a false return. And in this particular case, there were some extremely telling pieces of evidence that came out of the trial, one of which was quite striking. And that is that $1.9 million check written on May 17th of 2004, the day before the defendant filed his claim with then-Congressman Dreyer's office. And the argument has been made that, well, that check was written back in 2004, a substantial period of time after the return that was filed and charged count one. The interesting thing about that check, however, is that the record would show there was no dispute, apparently, that it was written by anybody other than the defendant. His mother testified it wasn't her signature. And his brother said that's his handwriting. His ex-wife, or estranged wife, who worked with him and repeatedly saw him sign documents said that's his handwriting also. There was no dispute. He submitted that check. I also note that this morning it appears as though the appellant is not contesting that count, that count six. I believe the comment was made that the argument here is about sufficiency of evidence in the confrontation clause. We have argued that, in fact, that $1.9 million check where he forged his mother's signature and was sent to the IRS was part of a somewhat sophisticated scheme to lead the IRS to believe that, in fact, these returns and these refunds were, in fact, false. A comment has been made that, well, it's really not relevant to count one, the 2000 return, because he got the return. Well, he got the return because the W-2 was false. That's why he got it. It wasn't Wait, he got the refund? The refund. I'm sorry. He got the refund because, in fact, the W-2 that he submitted was false. The other thing that is quite telling is that that check was not only forged, but it was written on a count that had been closed for four years. The witness from American Express testified that it was a convenience check on an account of American Centurion Bank in Utah, but that account had been closed for a substantial period of time. If the defendant did that, it certainly appears that he did, and the jury could infer from that that he was, in effect, trying to provide the IRS with conduct. The check referred to CCK's employer ID number, EIN number, and the jury was entitled to and did, apparently, consider that to be relevant as to whether or not CCK was, in fact, paying the wages that he claimed and withholding the amounts. So we would argue that that, even though it was written in 04, was relevant, and the jury was entitled to take references or inferences in proving that the defendant was engaged in this particular scheme. The other thing that is quite telling is that the record shows that all the corporate tax returns, which were ultimately filed by CCK, November 6, 2003, were filed a few days before he started complaining to the Taxpayer Advocate Service. One of the exhibits that the government submitted in this particular case were the records of the Taxpayer Advocate Service, which are somewhat of a narrative of the context of the representatives of the IRS and the Advocate Service with the defendant, and that it was, we would submit, appropriate for the jury to infer that the corporate tax returns filed in 2003, several years after he was claiming that he had been paid wages and had amounts withholding in 2000-2001, was, again, part and parcel of an attempt which is similar to the one that he resorted to with the $1.9 million check. In addition, his contact with the tax preparer, particularly Joseph Irlanda, who had 25 years in the tax preparation business, where, when challenged by Mr. Irlanda for verification of the amounts that he was claiming as wages and withholding, he, Joseph Irlanda, testified, he checked his records, and he thought that was, he had that conversation with the defendant of January 23rd of 2004, I believe, and the defendant, first of all, said he wasn't going to provide him any W-2. Secondly, Mr. Irlanda asked him for the phone number of someone who could verify the payroll. Defendant didn't give him that. Third, Mr. Irlanda asked him for a business card which would authenticate his position as someone who would be able to verify the actual wages. Defendant did not respond to the satisfaction of Mr. Irlanda. At that time, Mr. Irlanda already had information that one of the returns had been rejected by, or at least, not the return, the Franchise Tax Board had notified Mr. Irlanda that after the 2002 return, the W-2 was invalid, and that was one of the reasons why Mr. Irlanda challenged the defendant at that January 23rd What does the defendant do? The defendant left, goes to another tax preparer six days later, and presents the testimony in the record as clear. He presented not a CCK W-2, but an ECPI, which is Everyone Can Play, Inc., the successor corporation. It's impossible not to agree with counsel that, in and of themselves, each one of these little pieces might not be conclusive and might not allow someone to conclude beyond reasonable doubt that the defendant was involved in a scheme. However, when taken together and considered together, they certainly would confirm that. Counsel, I have a question on the confrontation clause. Why wasn't cross-examination on Ms. Snyder's credibility within the scope of direct? I believe it's clear that when a witness testifies, their credibility can be tested, and defense had the right to test the credibility. However, the court has the discretion to control the manner in which that testing occurs, and the questioning that was allowed, I believe comments have been made earlier, that the judge merely indicated to the defense attorney that he could not ask the question. No, I realize that, but his ruling was that it wasn't within the proper scope of cross-examination, and I don't, I mean, I don't, I disagree with that, that you're saying that even if it was, it was permissible because he could require her to call her, call Ms. Snyder in the defense case. Candidly, Your Honor, I agree with counsel that I'm not aware of any cases which say that calling the witness on direct in the defense case would be a substitute for appropriate cross-examination of a government witness. Right, so what is your argument? The argument is this case, there was not a confrontation violation in the sense that it would require any remedy for the following reasons. Number one, the information was in front of the jury. Marlene Snyder, defendant's mother, had testified. Before that, her daughter had testified, Diane Jamie, that my mom told me not to say anything. The other thing is the inference. If he had been, the defense attorney, been allowed to ask that question, and Marlene Snyder had said, yes, I told her not to disclose that, not to say anything about the check, not to say anything about the check. As the court noted later on during the colloquy about, during the colloquy about reconsideration of this ruling. I'm sorry, we're getting feedback. Go ahead. I thought it might have been a question. The judge noted that, in fact, the reasonable and most likely inference, if the mother defendant says, don't say anything, she's protecting him, which would not go to bias. It would not go to bias of the mother. If anything, it would go toward her motivation to protect him. And so the jury was not deprived of it. So is it your position that if there was error, it was harmless beyond a reasonable doubt? Certainly. I think in retrospect, it may have been more appropriate for the trial court to articulate a different reason rather than beyond the scope of direct for controlling and restricting cross-examination under all these circumstances that the court, the trial court. But it's a position of the government precisely that, that if there was error, it's harmless beyond a reasonable doubt. If there's no further questions, then we would submit at this point. Oh, I had a, I had a question about the closing argument with the sunrise analogy. I don't know if you were the trial lawyer or if that's someone else. I was, Your Honor. I'll never use it again. No, frankly, I, my, my argument is that it was a somewhat misdirected attempt to describe not necessarily the conclusions, but the process that the jury could and should go through in terms of analyzing and then draw inferences from those facts. Usually they're drawing an inference about some ultimate fact that's in dispute, whereas it's not really arguable whether the sun is rising in the east. So it seems somewhat misleading to me. Well, I, I frankly, when I saw the argument in the briefing, I thought, first of all, it never occurred to me as a trial attorney. Second, it should have, but it didn't. And secondly, it was very, very insightful and creative on the part of the defense and the appellant's attorneys to point that out. However, I believe the record will confirm that an attempt, I made an attempt to emphasize the deferential, my, the government's deferential approach towards the jury's responsibility and opportunity, that these were inferences that they could draw, that they might draw from, from the evidence. There was nothing indicating as a result of that illustration that it was mandated, that there was only one conclusion that, that they could or should draw from the evidence that was presented. Was there an objection at the time? Was there an objection at the time? I don't think so. I believe there was an objection, but I believe it was at the end of the argument. It was not immediately at that time. All right. Thank you. Thank you, counsel. The case... Thank you very much. Thank you. The case of U.S. v. Richardson will be submitted. The court will be in recess for about 5 to 10 minutes. Thank you.
judges: Wardlaw, Gould, Ikuta